# United States Court of Appeals

## For the First Circuit

No. 03-1830

UNITED STATES PUBLIC INTEREST RESEARCH GROUP,
STEPHEN E. CRAWFORD, CHARLES FITZGERALD,

Plaintiffs, Appellees,

—————————————————

NANCY ODEN,

Plaintiff,

v.

ATLANTIC SALMON OF MAINE, LLC,

Defendant, Appellant.

—————————————————

No. 03-1831

UNITED STATES PUBLIC INTEREST RESEARCH GROUP,
STEPHEN E. CRAWFORD, CHARLES FITZGERALD,

Plaintiffs, Appellees,

—————————————————

NANCY ODEN,

Plaintiff,

v.

STOLT SEA FARM, INC.,

Defendant, Appellant.

—————————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Boudin, <u>Chief Judge</u>,
Torruella, <u>Circuit Judge</u>, and
Baldock,[*] <u>Senior Circuit Judge</u>.

   <u>Richard E. Schwartz</u> with whom <u>Adam D. Wilson</u> and <u>Crowell &
Moring LLP</u> were on brief for appellants.
   <u>David A. Nicholas</u>, with whom <u>Joshua R. Kratka</u>, <u>Joseph J. Mann</u>,
<u>National Environmental Law Center</u> and <u>Bruce M. Merrill</u> were on
brief for appellees.
   <u>G. Steven Rowe</u>, <u>Attorney General</u>, State of Maine, and
<u>Christopher C. Taub</u>, Assistant Attorney General, State of Maine, on
brief for State of Maine, amicus curiae.

August 6, 2003

[*] Of the Tenth Circuit, sitting by designation.

**BOUDIN, Chief Judge**.  This is an appeal by two companies ("the companies") engaged in operating salmon farms in Maine: Atlantic Salmon of Maine, LLC, and Stolt Sea Farm, Inc.  In a citizen-suit civil action under the Clean Water Act, 33 U.S.C. § 1365 (2000), the district court found the companies liable for polluting Maine waters, USPIRG v. Atl. Salmon, LLC, 215 F. Supp. 2d 239 (D. Me. 2002) ("Atlantic Salmon I"), and granted injunctive relief, USPIRG v. Atl. Salmon, LLC, 257 F. Supp. 2d 407 (D. Me. 2003) ("Atlantic Salmon II").  The companies claim that the district court's authority to grant injunctive relief has been superceded by a subsequent state permit.

We recount only what is needed to frame the legal issues before us.  The two companies are engaged in sea-farming or "aquaculture."  Its key feature is that young salmon, called "smolts," are transferred from freshwater hatcheries to sea cages called "net pens," the net pens being submerged in ocean water.  The smolts are held in these net pens for 18 months or so while they mature and the salmon are then harvested.  The origin of this case is the pollution that occurs in various forms incident to the net pen operations.

Atlantic Salmon began operating salmon farms along the Maine coast in 1988 and currently operates four farms (previously five) in Machias Bay and two in Pleasant Bay.  It also owns two other companies that together operate seven more farms.  Stolt,

-3-

which began operating in Maine in 1987, runs three farms in Cobscook Bay and has a subsidiary operating two more salmon farms. Both parent companies hold aquaculture leases from the Maine Department of Marine Resources and site permits from the Army Corps of Engineers.

The Clean Water Act provides that, except as otherwise authorized, "the discharge of any pollutant [into navigable waters] by any person shall be unlawful." 33 U.S.C. §§ 1311(a), 1362(12) (2000). One of the exceptions allows discharge where the person holds a discharge permit from the Environmental Protection Agency ("EPA") or, if the state has been authorized by EPA to conduct its own program, a state discharge permit. 33 U.S.C. §§ 1342(a)(1) & (b) (2000). Where the state issues a permit, EPA retains power to veto it, 33 U.S.C. § 1342(c)(3) (2000), subject to review in the federal courts of appeals. 33 U.S.C. § 1369(b)(1) (2000).

The permits may be either "general," authorizing a class of operations by anyone, or "individual," i.e., specific to one permit holder. Tex. Oil & Gas Ass'n v. EPA, 161 F.3d 923, 929 (5th Cir. 1998); Atlantic Salmon I, 215 F. Supp. 2d at 245 n.2. The grant or denial of a federal permit is reviewable in the appropriate federal court of appeals, 33 U.S.C. § 1369(b)(1) (2000), and state permits are reviewable under state law and subject to EPA veto. However, while a permit is in effect, it protects the holder (with exceptions not here relevant) against

-4-

claims that the holder is violating the Clean Water Act, thus providing a kind of safe harbor or shield.  33 U.S.C. § 1342(k) (2000).[1]

The companies in this case say that in the late 1980s EPA told them that they did not need a permit under the Clean Water Act; but indisputably in 1990 EPA told the companies that they did need permits.  In the same year the companies began to seek permits for one or more sites, and further applications (and entreaties for action) followed but EPA never issued permits for any of the companies' sites.  Instead, EPA began what appears to have been a leisurely process of consultation, ending in January 2001 with EPA delegating to Maine the authority to issue permits.

On September 25, 2000, the United States Public Interest Research Group and two of its members (collectively, "USPIRG"), filed suit against the companies in district court to enjoin the discharge of pollutants without a permit. The Clean Water Act permits such citizen suits and invests the district courts with authority to enjoin violations. 33 U.S.C. § 1365(a) (2000).  There ensued discovery and cross motions for summary judgment before a magistrate judge.  In February 2002, the magistrate judge

---

[1]Atl. States Legal Found. v. Eastman Kodak, Co., 12 F.3d 353, 357 (2d Cir. 1993); see also E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 138 n.28 (1977) ("The purpose of § 402(k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict.").

recommended that summary judgment be granted against the companies. Atlantic Salmon I, 215 F. Supp. 2d at 241-42; USPIRG v. Stolt Sea Farm, Inc., Civ. No. 00-149-B-C, 2002 WL 240386 (D. Me. Feb. 19, 2002).

On June 17, 2002, the district judge issued a decision adopting the recommendation, determined that the companies had violated the Clean Water Act, and ordered a hearing on injunctive relief and civil penalties. Atlantic Salmon I, 215 F. Supp. 2d at 241. After a lengthy evidentiary hearing in October 2002 followed by more briefing, the district court on May 28, 2003, issued a decision making further fact findings, rejecting various legal defenses by the companies, imposing a statutory civil penalty of $50,000 on each of the two companies, and ordering injunctive relief. Atlantic Salmon II, 257 F. Supp. 2d at 416-27, 434-36.[2]

The two injunctive provisions of principal concern here required specified periods of fallowing (that is, temporary idling) of net pens after the next harvest and prohibited the future stocking of any of the companies' net pens with non-native strains of salmon. Atlantic Salmon II, 257 F. Supp. 2d at 435-36. The court also ordered that each pen be stocked with only a one-year

_____

[2]In early May 2003, the district court also held Atlantic Salmon in civil contempt for violating an interim directive issued in January 2003 against stocking any new class of fish pending the decision on full-scale injunctive relief. USPIRG v. Atl. Salmon, LLC, Civ. No. 00-151-B-C, 2003 WL 21068373, at *13-*14 (D. Me. May 9, 2003).

class of fish at any time.  Id. at 435.  However, the court did allow fish currently in the pens to be harvested, both to avoid irreparable loss and because the environmental harm would be reparable.  Id.  at 435-36.

While the district court was considering this case, the Maine Board of Environmental Protection was conducting proceedings looking to the issuance of a general permit covering all Maine salmon farming operations.  Draft permit provisions were made known to the district court during its deliberations.  Atlantic Salmon II, 257 F. Supp. 2d at 430 n.19.  On June 19, 2003, the Maine Board issued its general permit, which is currently being challenged in the Maine Superior Court by USPIRG.  USPIRG v. Bd. of Envtl. Prot., Docket No. AP-03-43.  The permit is currently effective but provides protection for individual companies only after a notice period.

The companies have now appealed to this court to challenge the injunction.  Because of the impact on their ongoing operations, they sought expedited briefing and oral argument, which we granted, and a stay of the injunction pending our decision, a request that we denied immediately after the oral argument on July 29, 2003.  The companies have primarily focused on a single claim, namely, that the district court's injunction is beyond its "jurisdiction" insofar as the terms of the injunction differ from those of the Maine general

permit.  Maine regulators have filed an amicus brief supporting this position.

The companies do not challenge the district court's ruling that they have been violating the Clean Water Act for over a decade or its rejection of their various defenses (e.g., laches, estoppel, de minimus effects).  Yet the liability ruling is a necessary backdrop for demarcating the district court's authority vis-à-vis that of EPA and Maine.  Congress set out in the Clean Water Act to solve a set of practical problems, and any useful construction of the statute must be responsive to this objective. See, e.g., Chapman v. United States, 500 U.S. 453, 473 (1991).

In this case, the district court found that both companies had discharged into navigable waters, in violation of the statute, five types of pollutants: non-North American salmon that escape from the pens; large quantities of salmon feces and urine that exit the pens; uneaten salmon feed containing a range of chemicals for combating infection and providing coloring; other chemicals to fight sea lice; and copper that flakes from the net pens themselves.  Atlantic Salmon I, 215 F. Supp. 2d at 247-49; USPIRG v. Stolt Sea Farm, Inc., Civ. No. 00-149-B-C, 2002 WL 240386, at *5-*7 (D. Me. Feb. 19, 2002), aff'd USPIRG v. Stolt Sea Farm, Inc., Civ. No. 00-1490B0C, 2002 WL 1552165, at *1 (D. Me. June 17, 2002).

That the wastes and chemicals should be classified as pollutants of the sea floor and waters is hardly surprising; but the district court also found that non-native strains of salmon are pollutants under the statute and regulations. Atlantic Salmon II, 257 F. Supp. 2d at 420-22. The reason is that through a variety of causes, some of the penned salmon tend to escape and to interbreed with native North Atlantic salmon;[3] and through competition from the non-native salmon and the genetic effects of interbreeding, the native strain's survival is threatened. Id. North Atlantic salmon is currently listed as an endangered species. Id. at 420.

Just how serious and immediate this threat may be is a matter of dispute. But the companies do not challenge the ultimate finding that non-native species are a pollutant and can be banned. The Maine Board's general permit also has a ban on non-native species, although one more flexible than that adopted by the district court. The companies do not dispute that the other pollutants are regularly released by their operations nor do they now claim that their past operations complied with the statute.

Instead, the companies argue that in three respects the injunction, as applied to their future operations, is at odds with more lenient regulation limned by the Maine Board general permit.

_____

[3]The escapes, well documented in the case of Atlantic Salmon and less so as to Stolt, result from natural wear or injury to the pens, accidents in delivering the fish, submergence of the open pens tops in bad conditions, and other documented causes. Atlantic Salmon II, 257 F. Supp. 2d at 412, 414.

The areas of alleged conflict are the treatment of non-native salmon, the fallowing schedule, and (potentially) the limits on one-class year stocking--all matters described more fully below. However, the threshold question is whether it is premature for us to consider this so-called jurisdictional attack at all.

At the time the injunction was issued, the general permit itself had not been issued. Indeed, after it was issued, it did not apply to the two companies until a notice period expired. However, the general permit became effective for at least one farm of each company in late July 2003. Although the permit has itself been challenged in state court by USPIRG, it would--but for the injunction--be the main regime governing the companies' future operations.

Yet, the general permit is an event occurring after the issuance of the injunction, and ordinarily the proper course would be for the appellants to seek a modification by the district court before raising the conflict issue with us. Cf. Fed. R. App. P. 8(a)(1)(c); Daubert v. Schmidt, 498 F. Supp. 1344, 1346 (E.D. Wis. 1980). Until then, ordinarily there would be no error to be reviewed. However, in this instance the district court anticipated the permit, drafts of which were known to it, and expressly addressed the then-prospective question of conflict between the injunction and the general permit.

On the two main issues--fallowing and non-native species--the district court's decision adopting the injunction makes clear that the obligations imposed by the injunction are intended to apply notwithstanding any less stringent regulation of the same topics that might be imposed by the state permit. Atlantic Salmon II, 257 F. Supp. 2d at 435-36. In short, the district court in issuing the injunction considered and rejected the companies' present claim that the injunction should be qualified by the permit. The district court reaffirmed this position when, on June 25, 2003, it denied the companies' motion for a stay of the injunction pending this appeal. USPIRG v. Atl. Salmon, LLC, Civ. No. 00-151-B-C (D. Me. July 25, 2003).

This brings us to the merits of the so-called jurisdictional objection that the companies assert. The term "jurisdiction" has several reasonably distinct usages in relation to court authority (e.g., subject matter jurisdiction, personal jurisdiction), although it is sometimes used simply as an epithet meaning little more than that an issue is fundamental or important. The more specific usages entail specific consequences: here, the companies urge that their objection is based on subject matter jurisdiction and therefore (among other consequences) requires de novo review of everything but raw factual findings. Francis v. Goodman, 81 F.3d 5, 7 (1st Cir. 1996).

-11-

The companies' characterization of their objection is doubtful. The Clean Water Act expressly grants the district court authority--that is, subject matter jurisdiction--to enforce the statute against violators and to provide equitable relief, and the companies do not contest that they violated the statute. Their main argument is essentially a substantive claim, based on language in the statute, that in granting relief the district court must refrain from ordering conduct that an effective permit would allow. Still, this is an issue of law even if non-jurisdictional so in any event we review the issue <u>de novo</u>.

The companies' statutory argument is straightforward. Although the statute authorizes the court to enforce the Clean Water Act against violators, it also provides--in the so-called shield provision--that compliance with an effective permit is compliance with the statute. 33 U.S.C. § 1342(k) (2000); <u>Atl. States Legal Found.</u> v. <u>Eastman Kodak, Co.</u>, 12 F.3d 353, 357 (2d Cir. 1993). Thus, say the companies, the injunction must give way to the permit wherever they "conflict"--a concept they construe generously. Otherwise, the district court would be overriding the substantive protection granted by the shield provision.

The supposed conflicts between court and agency authority in this case are several. The sharpest contrast between what is required by the injunction and by the permit concerns the stocking of non-native species. Up to now, the companies have included in

-12-

their pens non-native species of salmon which are apparently bred for economically desirable characteristics. <u>Atlantic Salmon II</u>, 257 F. Supp. 2d at 420-22. Such non-native salmon were in the pens when the injunction issued. The district court did not require removal of those salmon already in the pens but did ban outright any future introduction of non-native species. <u>Id.</u> at 435-36.

The Maine general permit, by contrast, says that non-native salmon can be re-stocked until July 31, 2004; thereafter the stocking must be of native salmon unless the permit holder proves that native stock is not available in sufficient quantities to match the farm's prior stocking level based on historical data. Maine Permit 24. The injunction thus provides a flat ban for future stocking effective immediately, preventing the companies from transferring smolts due to be placed into the pens this summer (July-August 2003); the permit by contrast would permit this stocking.

The second supposed conflict is slightly less direct. The district court ordered that the companies' pens once emptied remain fallow for fixed periods: 24 months for most, 36 months for one badly degraded site, and 6 months for the least afflicted site. <u>Atlantic Salmon II</u>, 257 F. Supp. 2d at 435. The Maine permit requires fallowing only "for a sufficient time to avoid harboring or spread of diseases from one class year to the next," allowing retention of carryover stock for reproduction purposes of up to 10

-13-

percent of the prior fish in the last year class, unless otherwise directed.  Maine Permit 30.

Lastly both the injunction and the Maine permit seek to reduce the risk of pathogens inside the pens, which can also infect fish outside the pens, by requiring that operators stock individual pens with only a single-year class of salmon at any one time.  Thus a net pen stocking salmon of the 2003 year class would have to be emptied before 2004 salmon were introduced.  Atlantic Salmon II, 257 F. Supp. 2d at 435; Maine Permit 30.  The companies see a potential conflict because the district court ban would apply--unless modified--even if the Maine Board were in the future to relax this restriction.[4]

It is evident that the conflict in all three instances is of a specific kind, namely, that the district court's restriction is more demanding than the state permit.  Hypothetically, the vaguely phrased state fallowing restriction might turn out to be more stringent in a specific case; but this would probably be rare. In all events, the injunction in this case would be unlikely to impair a stricter permit because the injunction explicitly requires compliance with federal and state requirements as well as the more

---

[4]As to this provision, there is arguably a ripeness objection to litigating the matter now, Abbott Labs. v. Gardner, 387 U.S. 136 (1967), but it turns out not to matter in this case.  The other two conflicts are live enough to justify consideration of the legal issues addressed in this decision and no issue peculiar to the single-year class stocking is presented in the briefs.

specific requirements of the injunction.  Atlantic Salmon II, 257 F. Supp. 2d at 435.

Accordingly, our concern here is with an injunction that requires more of the companies than an agency permit sanctioned by the federal statute.  And, if the companies had never violated the statute and now held a valid state permit, the shield provision in the statute would protect the companies as to future operations, 33 U.S.C. § 1342(k) (2000).  In such a case we would agree that the district court could not substitute its view as to what the Clean Water Act required for that of the agency.

Here, however, the companies have violated the statute; and, despite the companies' argument to the contrary, nothing in the shield provision's language directly addresses the question whether and when in such a situation the district court's authority gives way to the agency's.  This is hardly unique: overlapping grants of authority are the common stuff of statutes and the fare of judicial decisions. 2 Pierce, Administrative Law Treatise § 14-1 (4th ed. 2002).  Here Congress may never have thought about the precise issue of how the shield provision should affect a district court order issued before a permit and designed to remedy pre-permit violations.  Certainly nothing definitive is cited to us.

Sensibly reconciling court and agency power is not very difficult.  In our view, the fact that violations have occurred in the past does not generally strip the violator of the shield's

protection as to future operations; but so long as a district court does not reduce the environmental protection provided by the permit, the court may grant additional injunctive relief governing the post-permit operations of the companies insofar as the court is remedying harm caused by their past violations. This is a loose formulation, but it is sufficient for the present case.

This premise gives meaning to the statute's grant of enforcement authority to the court without undercutting the ability of the agency to regulate generally through the permitting process. Conventionally, a court's equitable power to enforce a statute includes the power to provide remedies for past violations--an area in which the courts have settled authority and competence, Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), and "the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." Id. at 313 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946)); accord United States v. Mass. Water Res. Auth., 256 F.3d 36, 48 (1st Cir. 2001).

The language of the enforcement provision is generous: it says that the district court has authority "to enforce [] an effluent standard or limitation," 33 U.S.C. § 1365(a), a phrase that encompasses the pollution ban in this case. Atlantic Salmon I, 215 F. Supp. 2d at 245-46, 256-57. Nothing in this language precludes, as part of this enforcement authority, measures

-16-

remediating the harm caused by an existing violation, nor have we been cited to any legislative history or circuit precedent imposing such a limitation. Cf. United States v. Alcoa, 98 F. Supp. 2d 1031 (N.D. Ind. 2000).

This view does not disregard the shield provision which still fully protects non-violators and also protects violators except so far as more may be required of them than of others until they have repaired the damage they have done. True, for this limited purpose, the agency's judgment that less is necessary will not control; but it is hardly inevitable that the agency's general permit calculus will focus on the special remediation that may be required by a violator's individual past transgressions. In any case the statute gives the district court authority to make this judgment so far as it is remedial.

Of course, if the district court thought that the agency's general permit requirements were themselves adequate to remedy past violations, it might defer to the agency's solution. But, so far as authority goes, the remedying of past violations, so long as it does not reduce protection ordered by the agency, is a matter of district court judgment reviewed for abuse of discretion. United States v. Deaton, 332 F.3d 698, 714 (4th Cir. 2003). That does not mean that a district court's judgment is untrammeled but only that it is not ousted by the later grant of a permit.

There is not much direct precedent but the closest case in point comports with our own reading.[5]  In <u>National Resources Defense Council</u> v. <u>Southwest Marine, Inc.</u>, 236 F.3d 985 (9th Cir. 2000), the district court was concerned with a company that had a permit but had been violating its terms--not a situation identical to our case but somewhat analogous.  On appeal, the question was whether the district court was confined to merely ordering that the permit be observed or whether it could impose additional obligations to remedy the violation.  The court rejected the more restrictive view, saying (<u>id.</u> at 1000 (quoting <u>Alaska Ctr. for Env't</u> v. <u>Browner</u>, 20 F.3d 981, 986 (9th Cir. 1994))):

> According to Defendant, a court may do little more than tell the violator to comply with the applicable [state plan] requirements. . . .
> We do not agree that a district court's equitable authority is so cramped.  The authority to "enforce" an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed.  So long as the district court's equitable measures are reasonably calculated to "remedy an established wrong," they are not an abuse of discretion.

The companies say that in <u>Southwest Marine</u> there was less or no "conflict" between the plan and the injunctive relief.  But the Ninth Circuit's broad proposition--that the court may go where

---

[5]There are also some consonant cases involving different sections of the Clean Water Act that are in accord with our approach. <u>See, e.g.</u>, <u>Deaton</u>, 332 F.3d at 713-14 (affirming remedial injunction for violation of the statute, even though the remedial order required defendants to do more than what would be required to comply with the statute had they never violated the Act).

the agency's plan did not in order to remedy a past violation--is what is relevant. As we have seen, the "conflict" in this case is not a dangerous one. It is confined to injunctive measures that do or may go beyond state protections for the purpose of remedying past violations and vindicating the statutory prohibition on non-permitted pollution.

Whether this last proposition governs the present case is debated by the companies, and this is not surprising. The district court's injunction, after all, was framed before the general permit became effective. Thus, the district court was not at the time necessarily confined to remedying past violations (as opposed to preventing new ones based on its own view of the Clean Water Act). Nevertheless, as we will see, the district court's remedial aim is sufficiently clear as to the three contested provisions that a remand merely to make the court spell out this remedial purpose even more clearly would be a waste of time.

The district court's decision as to all three of the contested requirements had a remedial purpose. This is borne out by statements of the district court, Atlantic Salmon II, 257 F. Supp. 2d at 414, 419-21, 419 n.3, 420 n.5, 428-30, and by ample, if originally disputed, evidence as to the ongoing harm to the ocean and the native fish population caused by past violations. The varying periods set for fallowing further evidence a purpose to remedy past violations and not just to set general standards for

-19-

the future based on a different view of how all companies should operate.

In what is really a legal argument rather than one concerned with actual intent, the companies say that the purpose cannot be remedial because the injunction--like a permit--regulates future conduct. This is a classic non sequitur. Injunctive remedies for past harm commonly dictate future conduct so as to mitigate past harm. Lovell v. Brennan, 728 F.2d 560, 562-63 (1st Cir. 1984). To say that the injunction looks to the future does not alter the fact that it is rooted in past violations, nor prevent its aims or its effects from being remedial.

Conceivably, the companies could have challenged the substantive findings linking the admitted past violations to the remedial provisions of the injunction. They do so only in one respect, namely, by arguing at the very end of their main brief that escaping non-native salmon do not degrade the native species and so the remedial provision is without support even if it is otherwise within the district court's authority. They point to gaps in the testimony of USPIRG's expert, along with testimony by their own expert at the remedy hearing that non-native salmon do not cause genetic damage to native salmon.

This is a permissible attack but hopeless on the facts. The companies' expert may or may not take a minority view among experts, but in any event USPIRG presented an expert who took the

-20-

opposite view and specifically refuted the companies' expert. The district court credited USPIRG's expert and was satisfied "beyond any reasonable doubt that use of [non-native salmon] stocks imperils the survival of wild salmon." Atlantic Salmon II, 257 F. Supp. 2d at 428 n.16. This conclusion was neither clearly erroneous nor irrational. That the Maine Board's own general permit severely limits non-native stocking further undermines the position urged by the companies.

In their reply brief, the companies now offer a further quite different legal argument against treating the injunction as a remedial measure. They say that, whether so intended or supported, any remedial injunction is barred by statutory language that precludes citizen suits where there is no current violation but only a past violation that has ceased. Specifically, the citizen suit provision says: "[A]ny citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation. . . . The district courts shall have jurisdiction . . . to enforce such an effluent standard or limitation. . . ." 33 U.S.C. § 1365(a) (2000) (emphasis added).

This argument may be forfeit because not presented in the opening brief, Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 354 (1st Cir. 1992), but it is useful to lay it to rest. The statute's use of the present tense does limit the district court's

authority; only citizen suits alleging that defendants are in violation of the Clean Water Act at the time suit is brought are cognizeable. Gwaltney v. Chesapeake Bay Found., 484 U.S. 49, 64-67 (1987). Accordingly, if the suit alleges a past violation but no present violation, it is subject to dismissal, at least assuming a timely objection (whether the requirement is jurisdictional or can be waived need not be decided here). Id. at 57-64.

But once a citizen suit is brought and establishes a present violation, there is nothing in the statute or in Gwaltney that prevents a court from ordering equitable relief to remedy the harm done in the past. See Romero-Barcelo, 456 U.S. at 313, 318, & related discussion above. Nor would it make policy sense to allow such a suit or remedy, if legitimate when brought, to be defeated by having the offender cease the violation as soon as the suit is filed while leaving the past harm unremedied. Gwaltney, 484 U.S. at 69 (Scalia, J., concurring).

We turn, finally, to two arguments that the companies have not made on this appeal. Notably, in the district court, the companies invoked the doctrine of primary jurisdiction. They were unsuccessful, Atlantic Salmon II, 257 F. Supp. 2d at 426, and have not pursued the issue in this court. Nevertheless, the interests served by the doctrine are such that a court may choose to invoke it on its own even if neither side raises the concern. So

something ought to be said about an issue implicit in the controversy and one that could easily arise in future cases.

In a nutshell, the primary jurisdiction doctrine permits and occasionally requires a court to stay its hand while allowing an agency to address issues within its ken. Ass'n of Int'l Auto. Mfrs. v. Comm'r, Mass. Dep't of Envt'l Prot., 196 F.3d 302, 304 (1st Cir. 1999); 2 Pierce, supra, § 14-1. Although sometimes treated as a mechanical and rigid requirement, the modern view is more flexible, United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956) ("No fixed formula exists . . . ."), and the decision usually depends on whether a reference will advance the sound disposition of the court case and whether failure to refer will impair the statutory scheme or undermine the agency to which the reference might be made. Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co., 215 F.3d 195, 205 (1st Cir. 2000) (listing relevant factors).

In this instance, the underlying scientific issues are clearly technical ones--a factor that encourages a reference to an agency--but expert testimony was employed in the court proceeding. Weighing against a reference were inter alia the need for reasonable dispatch--matched against a decade of delay by the pertinent agencies--and the necessary focus upon the actions of two particular companies. Indeed, we were advised at oral argument that USPIRG's efforts to broaden the Maine general permit

-23-

proceeding to include special concerns raised by the companies' past violations were rejected.

Conversely, because the district court's injunction does no more than impose additional constraints, it cannot undermine the central thrust of the Maine general permit regime; and, the court proceedings having now been completed, invoking the assistance of the agency would be a waste of time. Accordingly, a refusal in this case to make a primary jurisdiction reference prior to the state's issuance of the permit was neither a mistake of law nor an abuse of discretion. See also Student Pub. Interest Research Group v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1537 (D.N.J. 1984) (suggesting that primary jurisdiction should be invoked sparingly where it would preempt a citizen suit under the Clean Water Act).

A second issue not squarely raised by appellants also deserves mention. The injunction is inherently time limited as to one aspect of relief; the fallowing periods prescribed are only for one cycle beginning after the injunction. But the prohibitions on non-native stocking and inclusion of more than a single-year class of salmon in a pen appear to be permanent. Yet there may be doubt whether such specific provisions are permanently needed to remedy past harms which, in the nature of things, are likely to be assuaged with the passage of time. Cf. Swann v. Charlotte-

Mecklenburg Bd. of Ed., 402 U.S. 1, 32 (1971); Quinn v. City of Boston, 325 F.3d 18, 27 (1st Cir. 2003).

Once the past violations are remedied, the companies are normally entitled to be regulated as to the details of their operations on the same basis as other companies that do or might operate in Maine.  If the Maine Board's permit is defective in its detailed prescriptions, the remedy lies with an EPA veto or review in the state courts.  Given that the companies have not raised this objection directly, we think the sound course is leave it to them to seek modification of the injunction if and when they can show that their past harms have been remedied.

The judgment of the district court is affirmed without prejudice to future requests in the district court for modifications of the injunction.  The mandate shall issue forthwith without prejudice to petitions for rehearing or rehearing en banc.

It is so ordered.